**RYDER ENERGY DISTRIBUTION CORPORATION,**
**Plaintiff-Appellant,**

v.

**MERRILL LYNCH COMMODITIES INC., E.F. Hutton & Co., Inc., and New York Mercantile Exchange, Defendants-Appellees.**

**No. 12, Docket 84–7226.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 30, 1984.

Decided Nov. 15, 1984.

---

Richard A. Miller, New York City (Vincent J. Syracuse, Newman, Tannenbaum,

Helpern, Syracuse & Hirschtritt, New York City, of counsel), for plaintiff-appellant.

William T. Marshall, Jr., New York City (Jeffrey T. Letzler, New York City, of counsel), for defendant-appellee Merrill Lynch Commodities Inc.

William E. Hegarty, New York City (Henry G. Bisgaier, Peter Leight, Cahill, Gordon & Reindel, New York City, Charles S. Horgan, General Counsel, New York Mercantile Exchange, New York City, of counsel), for defendant-appellee New York Mercantile Exchange.

Before KAUFMAN, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

Ryder Energy Distribution Corporation (REDCO) appeals from a final judgment of the United States District Court for the Southern District of New York, Haight, J., dismissing all but one count of REDCO's complaint pursuant to Fed.R.Civ.P. 12(b)(6). In its complaint, REDCO alleges that the New York Mercantile Exchange (NYME), E.F. Hutton & Co. Inc. (Hutton) and Merrill Lynch Commodities Inc. (Merrill) violated various statutory and common law duties in connection with one of REDCO's commodity futures transactions. The district court granted defendants' motion to dismiss, concluding that defendants had breached no duty owed to REDCO. REDCO appeals this decision only as to NYME and Merrill. For the reasons that follow, we affirm with respect to NYME and reverse and remand with respect to Merrill.

## BACKGROUND

### A. Futures Trading

REDCO is a Florida corporation whose primary business is managing the fuel supply requirements of the other subsidiaries of its parent company, Ryder Systems, Inc. REDCO therefore deals and trades in a number of petroleum products, including No. 2 heating oil which can be used to fuel diesel powered engines. As part of its dealings in No. 2 heating oil, REDCO traded in the commodity futures market.

The mechanics of the futures market were explored in some detail in *Leist v. Simplot*, 638 F.2d 283, 286–88 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Therefore, we will keep our discussion of the market to a minimum and refer the reader to *Leist* for a more complete discussion of commodity futures trading.

Simply put, a commodity futures contract is a bilateral executory agreement for the purchase or sale of a designated commodity at a future date. All of the terms of the contract, except price, are established by the exchange on which the contract is traded. An individual wishing to trade in the futures market must utilize the services of a futures commission merchant (FCM). FCMs engage in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery and are registered with the Commodity Futures Trading Commission (CFTC). When an FCM receives a customer's order, it relays the order to one of its floor brokers who enters into the desired transaction. Finally, when two traders have reached an agreement on the floor of the exchange, the exchange acts through its clearinghouse to provide a mechanism for the handling and transfer of futures contracts. The clearinghouse serves as seller to all buyers and buyer from all sellers. The FCMs are treated as principals in the trading and the clearinghouse collects margin payments from them. If an FCM is not a clearinghouse member it must deal through an FCM that is.

A customer who, through his FCM, agrees to deliver a commodity under a futures contract holds a "short" position. A customer who agrees to accept delivery of a commodity and make payment holds a "long" position. Under section 4 of the Commodity Exchange Act (CEA), 7 U.S.C. § 6, futures contracts may be formed and discharged only on exchanges which comply with certain statutory requirements

and which have been designated as "contract markets" by the CFTC.

A party's obligation under a futures contract may be discharged in one of three ways. First, the party may perform his obligation under the contract, *i.e.*, deliver or accept delivery of the commodity. Only in rare instances does actual performance under a futures contract occur. *Leist*, 638 F.2d at 286 & n. 2. Second, a party seeking to liquidate his futures position may "offset." To offset, a party acquires an equal opposite position before the end of trading in the contract under which he is obligated. For example, a short would purchase an equal number of long contracts, or a long would sell an equal number of short contracts. The majority of futures contracts are discharged in this manner and money is made or lost on the difference between the original contract price and the offset contract price. *Leist*, 638 F.2d at 286–87. Finally, a party may discharge his obligation by engaging in a transaction known as an exchange of futures for physical (EFP).

To effect an EFP, parties with opposite futures positions negotiate a private contract covering the commodity involved. After completion of the negotiations, the parties report the existence of their private contract to their respective FCMs. The FCMs in turn report the contract to the exchange which then treats the futures positions of the parties as having been liquidated. By using an EFP, the long and the short are able, in effect, to offset through a privately negotiated transaction rather than the more common practice of acquiring an equal opposite position through the competitive execution of orders on the floor of the exchange. The parties are relieved of the standardized obligations of their future contracts and assume the negotiated obligations of their private contract.

As a general rule, the private negotiations that take place in an EFP violate CEA's prohibition against pre-arranged and non-competitive transactions. § 4c(a), 7 U.S.C. § 6c(a); 17 C.F.R. § 1.38. However, EFPs conducted in accordance with the rules of an exchange are exempt from the prohibition contained in section 4c(a). 7 U.S.C. § 6c(a); 17 C.F.R. § 1.38. These rules must be approved by the CFTC. NYME Rule 150.14, which has been approved by the CFTC, establishes the conditions under which an EFP involving No. 2 heating oil is permitted.

Rule 150.14 has three basic requirements. First, 150.14(A) provides that no EFP "shall be made by a seller who does not, at the time of such exchange, have in his possession the cash commodity to be delivered ...." Second, 150.14(B) provides that a report of the EFP must be submitted to the exchange and it must "contain the following information: a statement that the trade has resulted in a change of ownership, the kind and quantity of the cash commodity, the kind and quantity of the futures, the price at which the transaction is made, the names of the Clearing Members and such other information as the President may require." Third, 150.14(B) also provides that all documentary evidence including "evidence as to change of ownership and possession by the seller of the cash commodity shall be retained by the parties ...." Rule 150.17 states: "References in these Rules to the 'seller' and 'buyer' shall mean the short Clearing Member and the long Clearing Member respectively."

To implement Rule 150.14 and to comply with the recordkeeping requirements of CFTC regulation § 1.35(e), 17 C.F.R. § 1.35(e), NYME requires that two forms— EFP–1 and EFP–2—be submitted by the clearing members involved in an EFP. EFP–1 requires the clearing members to "certify" that the transaction is "bona fide" and that ownership and possession of the cash commodity "will be" transferred. J.App. at 118. In addition, the clearing member for the short must certify that the short owns and has possession of sufficient cash commodity to cover the contract. EFP–2, which is apparently filed subsequent to EFP–1, requires the clearing members to certify that payment and change of ownership and possession "has occurred." J.App. at 119. It is the alleged non-compli-

ance with and non-enforcement of these EFP rules that form the basis of the complaint before us.

## B. *REDCO's Trading*

Except where noted otherwise, the following facts are not in dispute.[1]

In March 1982 REDCO was long 87 futures contracts traded on NYME covering 87,000 barrels of No. 2 heating oil. Hutton was REDCO's FCM on 37 of these contracts and Merrill was REDCO's FCM on the other 50 contracts. Determined to extinguish its obligation under these contracts, REDCO decided to conduct an EFP with Two Oil Inc. (TOI). In order to conduct the EFP, TOI opened a commodity account with Merrill and established a short position mirroring REDCO's long position. Merrill was TOI's FCM on all 87 of these futures contracts.

On March 15, 1982, TOI "book transferred" 87,000 barrels of oil to REDCO.[2] On March 16, 1982, REDCO wire transferred payment of $3,471,300 to TOI's account at Houston City Bank. On March 16, the EFP terms and specifications and the book transfer by TOI were reported by REDCO to Hutton and Merrill. Hutton and Merrill reported a portion of the total EFP transaction (37 contracts) to NYME and 37 of REDCO's futures contracts were extinguished. On March 17, Merrill reported the remainder of the EFP to NYME and REDCO's remaining 50 futures contracts were extinguished. On both March 16 and

17, Merrill filed Form EFP-1 certifying that TOI owned and had possession of 87,-000 barrels of oil. REDCO alleges that Merrill made its certification without inquiring whether TOI actually owned and possessed the oil.

In early May 1982, REDCO sought actual delivery from TOI; TOI had no oil in May, had had none in March, and was now insolvent. Faced with the loss of almost $3.5 million, REDCO commenced this suit in October 1982. In its complaint, REDCO alleges that Merrill and Hutton, acting as its FCMs, violated federal law, exchange rules and common law duties when they certified the REDCO/TOI EFP as bona fide and when they refused to comply with NYME delinquency and default rules once it became apparent that TOI was not going to deliver the oil. REDCO also alleges that Merrill, acting as TOI's FCM, violated federal law, exchange rules and common law duties when it recklessly certified that TOI owned and had possession of 87,000 barrels of oil. Finally, REDCO alleges that NYME violated federal law, its own rules and common law duties when it permitted a sham EFP to be cleared through its exchange system and when it subsequently failed to enforce its delinquency and default rules.

## C. *District Court Decision*

In dismissing the complaint pursuant to Rule 12(b)(6),[3] the district court did not confront each of REDCO's separate causes

---

**1.** In explaining the facts and the theories of liability alleged by REDCO, we have examined REDCO's original complaint and its proposed amended complaint. The proposed amended complaint pleads additional facts in support of REDCO's claims and breaks down two of the original claims for relief—first and fifth—into four proposed claims for relief—first, second, sixth and seventh. In essence, it simply clarifies the original complaint. Because the proposed amended complaint was before the district court when it granted the motion to dismiss and in light of that court's conclusion that it added nothing of substance, we look to both complaints when determining if the motion to dismiss was properly granted.

**2.** A "book transfer" is simply an entry on the books of the seller transferring ownership to the

buyer. It is an acceptable form of delivery under a No. 2 heating oil-New York Harbor contract. NYME Rule 150.04(A)(3). J.App. at 43.

**3.** Merrill filed an answer before making its 12(b)(6) motion. In light of our conclusion that even a proper 12(b)(6) motion could not have been granted, we need not consider whether the answer barred the 12(b)(6) motion or transformed it into a 12(c) motion. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir.1980). Moreover, even if Merrill's motion should have been treated as a 12(c) motion, in this instance the ultimate standards would be the same. *See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977).

of action. Rather, the court dismissed the complaint on the grounds that the defendants breached no duty owed to REDCO. The court stated: "REDCO's loss results solely from its own commercial transactions, uncomplicated by any act of omission or commission by these defendants which, in law or equity, could impose liability upon them." J.App. at 236–37. The court concluded that if REDCO's theory of liability was correct, FCMs or NYME would have to conduct due diligence inquiries into a seller's ability to perform each time an EFP was to be conducted. Believing such a duty would be impractical and would put an end to the EFP as a viable means of offset, the court determined that "there is no liability because there is no threshold duty to do other than what the defendants did." J.App. at 241. The court thus dismissed the complaint except for one count which alleged that Merrill had actual knowledge that TOI had no oil. After limited discovery, REDCO stipulated to summary judgment in favor of Merrill on this one count and final judgment was entered. Thereafter, this appeal of the original dismissal was commenced. After notice of appeal was filed, REDCO and Hutton entered into a stipulation of settlement. Accordingly, we are only concerned with the granting of the motion as to Merrill and NYME.

### DISCUSSION

■ The function of a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). The district court should deny the motion unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Moreover, the district court should not be swayed into granting the motion because the possibility of ultimate recovery is remote. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Finally, the district court must limit itself to a consideration of the facts that appear on the face of the complaint. If the court considers matters outside of the complaint, it must treat the motion as one for summary judgment and proceed under Fed. R.Civ.P. 56, giving the party opposing the motion notice, an opportunity to submit pertinent material and, if need be, conduct discovery. Fed.R.Civ.P. 12(b); *Estate of Smith v. Tarrant County Hospital District*, 691 F.2d 207, 208 (5th Cir.1982); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir.1979); *Newman Oil Co. v. Atlantic Richfield Co.*, 597 F.2d 275, 277 (Temp. Emer.Ct.App.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 55 (1979); *Hansbury v. Regents of University of California*, 596 F.2d 944, 947–48 & n. 13 (10th Cir.1979).

■ At the outset, we note that a reading of the district court's opinion makes it clear that the court considered facts outside of the complaint in granting the motion to dismiss. In reaching its conclusion that defendants had no duty to do more than they did, the court refers, *inter alia,* to the following facts that cannot be found in the complaint: REDCO's previous dealings with TOI, REDCO's reasons for conducting an EFP, Merrill's inability to find REDCO an EFP partner, REDCO's seeking out TOI as an EFP partner, REDCO's introduction of TOI to Merrill, Hutton and NYME's lack of knowledge of TOI's default until June 11 and NYME's instigation of a rules compliance investigation after June 11. It was error for the court to rely on these facts in granting a 12(b)(6) motion. If the court believed that these facts were determinative, it should have converted the motion into one for summary judgment and so notified the parties. This procedural error, however, would not require reversal if the dismissal can be justified without reference to matters outside of the complaint. *Chicago-Midwest Meat Association v. City of Evanston*, 589 F.2d 278, 282 (7th Cir.1978), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979); *Medina v. Rudman*, 545 F.2d 244, 247 (1st Cir.1976), *cert. denied*, 434 U.S. 891, 98

S.Ct. 266, 54 L.Ed.2d 177 (1977). It is to this inquiry that we now turn.[4]

## A. *NYME*

The gravamen of REDCO's complaint against NYME is NYME's alleged failure to enforce its rules. Specifically, in its third claim for relief, REDCO alleges that NYME failed to invoke Rule 150.15—the delinquency and default rule—when TOI failed to deliver the oil; in its fourth claim, REDCO alleges that NYME failed to prevent FCMs from violating the EFP rules; and in its sixth claim, REDCO alleges that NYME breached its agreement with the FCMs to abide by NYME rules and that REDCO is a harmed third-party beneficiary of that agreement.[5]

 The dismissal of the third claim was proper. Under section 5a(8) of the Act, 7 U.S.C. § 7a(8), NYME does have a duty to enforce its rules and if the delinquency and default rule is applicable to an EFP, NYME's failure to enforce it may give rise to a cause of action. *Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 670 (2d Cir.1984). The rule, however, does not apply to an EFP. As previously stated, the delivery terms of a futures contract are determined by exchange rules. *See, e.g.*, Rule 150.04, 150.09. Because the time, place and manner of delivery is standardized, a uniform definition of delinquency and default may be established. Such a definition is provided by Rule 150.15, which defines the day of delinquency as "the day following the last day on which a party may perform *his obligation under the Rules* without being delinquent in performance." Rule 150.-15(c)(3) (emphasis added). The obligations of the parties to an EFP, however, are determined, not "under the rules," but by the private contract negotiated by the parties themselves. The time, place and man-

ner of delivery will differ under each EFP; therefore, the uniform definition of delinquency is inapplicable. Because NYME had no duty to invoke Rule 150.15, the third claim fails to state a cause of action.

 The fourth claim also fails to state a cause of action. This claim alleges that although NYME knew or should have known that FCMs were violating EFP rules, it took no action to secure compliance. As previously stated, the failure of an exchange to enforce its rules may provide a cause of action. To avoid dismissal, however, a complaint must adequately plead bad faith on the part of the exchange. *Sam Wong*, 735 F.2d at 670. Moreover, we have recently made it clear that the bad faith requirement governs claims of both exchange action and inaction. *Id.* A claim of bad faith must be supported by two allegations: first, that the exchange acted or failed to act with knowledge; and second, that the exchange's action or inaction was the result of an ulterior motive. *Sam Wong*, 735 F.2d at 671; *Miller v. New York Produce Exchange*, 550 F.2d 762, 766–67 (2d Cir.), ·*cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). Although REDCO's complaint alleges knowledge on the part of NYME, it is devoid of any assertion that the failure to enforce the EFP rules stemmed from an ulterior motive. Nor is there anything in the record on appeal which suggests that such an allegation could have been made. The dismissal of the fourth claim, therefore, was proper.

In its sixth claim, REDCO alleges that it is a third-party beneficiary of the agreement between NYME and member FCMs to abide by NYME rules. REDCO asserts that as an intended beneficiary of this agreement it may maintain an action based on NYME's alleged breach of the agree-

---

**4.** We do not construe § 22 of the CEA, 7 U.S.C. § 25, which applies to private actions accruing after January 11, 1983, because REDCO commenced its action in October 1982.

**5.** The fifth claim for relief of REDCO's original complaint also asserted a common law breach of contract/negligence claim against NYME.

However, in apparent recognition of the absence of a basis for this claim, REDCO's proposed amended complaint does not assert it against NYME. We, therefore, will not address this claim other than to say that it was properly dismissed.

ment. It is unclear whether REDCO bases its claim on New York common law or federal law.

We need not decide whether New York law or federal law controls this claim because it fails under either. New York law rejects REDCO's third-party beneficiary claim. *Richards v. New York Mercantile Exchange* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,384 (Sup.Ct.N.Y. Feb. 19, 1982), *aff'd mem.*, 94 A.D.2d 688, 462 N.Y.S.2d 807 (1983), *motion for leave to appeal denied*, 61 N.Y.2d 604, 473 N.Y.S.2d 1025, 462 N.E.2d 155 (1984). In *Richards*, the court noted the absence of a direct contractual relationship between an exchange and a public trader and added that there was no intention to benefit the public in the agreements between an exchange and FCMs. *Richards*, ¶ 21,384 at 25,853–54. The court therefore rejected a third-party beneficiary claim.

The result under federal law would also be in NYME's favor. In asserting its third-party beneficiary claim, REDCO relies on a line of securities law cases that adopted such a theory. These cases were decided under a previous version of section 6(a) of the Securities Exchange Act of 1934 which required a stock exchange to file an agreement to enforce its rules with the SEC. Some courts concluded that the investor was the intended beneficiary of this statutorily mandated "contract" between an exchange and the government agency. *See, e.g., Weinberger v. New York Stock Exchange*, 335 F.Supp. 139 (S.D.N.Y.1971). *But see Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 782–88 (3d Cir. 1982), *cert. denied*, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983) (no implied private cause of action under either former or present versions of section 6). In the instant case, REDCO does not and indeed cannot claim to be a beneficiary under an agreement between an exchange and a government body because under the CEA there is no such agreement. Rather, REDCO is seeking to recover under an agreement between an exchange and private parties but fails to point to any evidence that it

is the intended beneficiary of that agreement. In fact, the only authority on this point, *Richards*, rejects REDCO's argument that it is an intended beneficiary. We need not decide this issue, however, because even cases such as *Weinberger* recognized that the standard of liability under this contract claim is the same as the standard under a direct claim that an exchange breached its statutory duty. The only apparent reason for recognizing the contract theory there was the longer statute of limitations. *Weinberger v. New York Stock Exchange*, 335 F.Supp. 139, 140, 145 n. 19 (S.D.N.Y.1971); *cf. Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 166 n. 5 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976). Having failed to state a cause of action under its statutory theory for failure to adequately plead bad faith, REDCO likewise fails to state a cause of action under its contract theory. Thus, the dismissal of the final claim against NYME was also proper.

### B. *Merrill*

In dismissing the complaint as to the FCMs for lack of a duty, the district court focused its discussion on Hutton. In so doing, the court apparently ignored an important fact; unlike Hutton's, Merrill's duty sprang from two sources. Like Hutton, Merrill had the duty of an FCM representing the buyer—REDCO. In addition, however, Merrill had the duty of an FCM representing the seller—TOI. It was in its capacity as TOI's FCM that Merrill was required, under Form EFP–1, to certify that TOI owned and had possession of enough oil to cover its EFP obligations.

We agree with the district court that in its capacity as REDCO's FCM, Merrill owed no duty to do other than what it did. The duty of an FCM for a buyer is laid out in Rule 150.14 and the EFP forms. The FCM for the buyer must report the terms of the EFP and certify the transaction as bona fide. REDCO would have us read a due diligence duty into the requirement that the buyer's FCM certify the transaction as bona fide. However, as the

district court correctly concluded, Merrill, *as REDCO's FCM,* had no duty to conduct a due diligence investigation into the affairs of TOI.

In certifying the transaction as bona fide, the buyer's FCM may rely on the representations made to it by the buyer. Merrill thus fulfilled its duty as REDCO's FCM when it accurately reported the information supplied by REDCO to the exchange and, based on REDCO's representation that ownership had been transferred and payment had been made, certified that from the buyer's perspective the EFP was bona fide.

Our conclusion that the buyer's FCM has no independent duty to conduct an inquiry into the seller's ability to perform is bolstered by two factors. First, it is supported by *C.E.A. Administrative Determination No. 87* (June 15, 1939), *reprinted as* Addendum to Br. for Appellee Merrill Lynch, which, in discussing the duty of FCMs to inquire into an EFP, ruled: "Statements obtained by you from the parties themselves ... would be about all that could be expected of you, we think, as futures commission merchant[s]." While this determination is not controlling, it provides useful guidance. Second, our finding that the buyer's FCM has no duty to inquire into the seller's ability to perform does not leave a regulatory gap in the EFP scheme because the seller's FCM does have such a duty.

 As the FCM for the seller, Merrill was required to certify that TOI owned and had possession of the 87,000 barrels of oil necessary to cover the contract. At a minimum, this meant that Merrill simply had to ask TOI if it had 87,000 barrels of oil. Merrill certified TOI's ownership of the oil without knowing whether its certification was accurate. Merrill thus breached its duty under the EFP rules. A question

remains, however, to whom this duty is owed.

Defendants argue here as they did below that the EFP requirements are designed only to maintain the market's price integrity by preventing non-competitive offsets under the guise of an EFP. Under their analysis, the duty to certify extends solely to the market as a whole and not to those parties engaged in the actual EFP. We decline to accept such a narrow interpretation. Although the primary beneficiary of the certification duty may well be the market, it is not unreasonable to assume that the buyer in an EFP might rely on the seller's FCM's performing its regulatory duties. The reasonableness of such reliance by a buyer is reinforced by looking at NYME advertisements which describe the regulatory scheme, the EFP process and the requirement that the seller have possession of enough oil to cover the EFP contract. *New York Mercantile Exchange, Hedging Energy Futures: Risk Management Through Commodity Futures* (1981), *reprinted in* J.App. at 120; *New York Mercantile Exchange, Petroleum Futures Delivery Process: New York Harbor/Gulf Coast Contracts* (1981), *reprinted in* J.App. at 139. Contrary to the district court's conclusion, recognizing that the limited duty of inquiry already imposed by the rules extends to a buyer will not put an end to EFP transactions. The seller's FCM's responsibilities are not expanded beyond what the rules already require and the basic relationships of the parties are not altered.

In light of our conclusion that the district court erred in considering matters outside of the complaint and in determining that Merrill's duty was no different than Hutton's, we remand this case to the district court for further proceedings. On remand, the district court will likely confront questions of estoppel and causation.[6] But neither the difficulty of proof nor the odds

---

**6.** In advancing its lack of causation claim, Merrill refers to a number of facts that appear outside of the complaint, in particular, a deposition which shows that REDCO knew TOI had no oil before the EFP was conducted. While we

agree with Merrill that these facts, particularly the deposition, raise issues of causation and estoppel, a 12(b)(6) motion is not the proper mechanism to resolve those issues.

against ultimate recovery justifies dismissing the complaint on a 12(b)(6) motion. *Adato v. Kagan,* 599 F.2d 1111, 1117 (2d Cir.1979); *Harmsen v. Smith,* 542 F.2d 496, 502 (9th Cir.1976), *cert. denied,* —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In remanding this case, we express no view on the ultimate viability of any of REDCO's several theories of liability against Merrill. Rather, we recognize that "[t]enuous theories of liability are better assayed in the light of actual facts than in pleader's supposition." *Adato,* 599 F.2d at 1117. Like the court in *Adato,* "[w]e believe that the making of an intelligent decision on this issue requires prior development of the facts." 599 F.2d at 1117–18.

Finally, we note that the district court denied REDCO's motion to amend its complaint, concluding "that the amended complaint would add nothing of substance." J.App. at 242. Under Fed.R. Civ.P. 15(a), leave to amend should be freely given when justice requires. We have previously recognized that "if the plaintiff has at least colorable grounds for relief, justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979). REDCO's claim against Merrill is, at this stage, colorable and from the record it does not appear that REDCO, in seeking to amend its complaint, is guilty of undue delay or bad faith. In addition, it appears that allowing the amendment would not prejudice Merrill. Therefore, the denial of the motion to amend, as it relates to Merrill, was error.

For the foregoing reasons, we affirm the dismissal of the complaint as to NYME and reverse the dismissal of the complaint and the denial of the motion to amend as to Merrill. The case is remanded for further proceedings not inconsistent with this opinion. Costs are allowed only to appellee New York Mercantile Exchange.